waters by building a breakwater is not authority to leave the new construction without a light. Harrison v. Hughes, 125 Fed. 860, 60 C. C. A. 442. Authority to store piles at the side of a creek or river is not authority to allow them to remain submerged at high water without any buoy or other mark. In other words, it does not follow from the fact that the respondent was authorized to place the piles where it did that it owed no obligation with respect to them. On the contrary, it was bound to so mark them that vessels navigating the creek would not run upon them without warning; and, in our opinion, this duty was not affected in the slightest degree by the fact that the piles were placed between high and low watermark. They constituted an obstruction to vessels navigating the creek at high water and such vessels were entitled to protection.

In our opinion also the respondent failed in the performance of its duty to mark the piles. No buoys were placed over them and we are not satisfied that there was anything at high tide to indicate their presence. If there were any floating piles, they were insufficient to serve as a warning. They would not show that others were hidden and, in themselves, were not especially dangerous. The respondent was guilty of negligence.

With respect to the claim of negligence on the part of the vessel: There is no proof that the master of the tug had any actual knowledge of the submerged piles, and we do not think that he was charged with notice of them. He testified that he had navigated at that place only at high water. He was hardly bound to know of a temporary obstruction of this nature.

The decree of the District Court is affirmed with interest and costs.

---

## THE T. N. WELLINGTON.

(Circuit Court of Appeals, Second Circuit. January 29, 1912.)

No. 168.

COLLISION (§ 102*)—STEAM VESSELS MEETING IN BRIDGE DRAW—MUTUAL FAULT.

Two steam vessels, which came into collision when passing through the draw of a bridge on Harlem River in the evening, after exchanging signals to pass port and port, both *held* in fault: one, which was moving slowly against the tide close to the north side of the center pier, for not reversing to permit the other to pass across her bow to the port side, and the other for not porting more and allowing for the set of the tide, which carried her down upon the other's bow.

[Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Thomas Airey, owner of the steam launch Oconee, against the steam tug T. N. Wellington, David J. Conroy, claimant. Decree for half damages, and claimant appeals. Affirmed.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The following is the opinion of the District Court, by Hough, District Judge:

On the evening of September 25, 1909, occurred the "night parade" of vessels as part of the Hudson-Fulton celebration. At about 7 p. m. the tug Wellington and the launch Oconee came in collision at Spuyten Duyvil bridge, and the Oconee received such injuries that she subsequently sank and became a total loss. The tide was ebb, and running out of the Harlem River at the rate of at least six miles an hour. Most of the witnesses put the speed even higher. The tugs Castle Point and Wellington had come in from the Hudson river, and were lying near each other waiting for the Spuyten Duyvil drawbridge to open. This bridge is 300 feet long; that is, 150 feet on each side of the pivot on which it revolves. When open and lying approximately east and west, it rests upon the center "pin" or center "pier," which is about 330 feet long. In response to whistles blown by the Castle Point the draw opened, the northerly end swinging to the east. The Castle Point proceeded through the southerly draw. The Wellington, which was near the westerly end of the center pier, entered the channel of the draw as the bridge began to swing, and ·according to her own statement kept close to the center pier, going against the tide under one bell. Her boilers were in bad condition, and she was able to make no more than 10 miles an hour in slack water. It is therefore obvious that under one bell and against a 6-mile tide she must have gone very slowly. The estimate of her own officers is not over 3 miles an hour, and the average estimate is nearer 2. The Oconee is a launch 30 feet long. It was in charge of the libelant, who, though not a licensed waterman or pilot, testified to long experience with launches, and manifested on the witness stand quite sufficient familiarity with the rules of the road and the customs of navigation.

The witnesses from the Wellington declare generally that when their vessel entered the draw the Oconee was one of a large fleet of small pleasure boats waiting on the southerly side of the Harlem to go out into the Hudson river and view the parade. This testimony seems to me based upon no special observation of the Oconee, and there is nothing in the evidence to cast doubt upon the statements of the Oconee's witnesses that when the draw began to open she was lying from 50 to 150 feet eastward of the easterly end of the center pier, intending to go through the northerly channel when the draw was opened. The Wellington, advancing through the northerly channel and keeping close to the center pier, did not see the Oconee until she had gotten to the middle thereof. Her master then saw both the running lights of the launch, and testifies that the latter was in such a position that her pilot should have seen both of his lights. The navigator of the Oconee did not see any lights on the Wellington, but it was not yet dark enough to prevent his knowing (as he testified) that he and the tug were approaching head and head. In this position the vessels exchanged a signal of one blast. The Wellington's master testifies that he followed the one blast almost immediately with an alarm whistle. The master of the Wellington did not hear the Oconee's whistle; but there can, I think, be no doubt that it was blown. The engineer of the Wellington testified in rather a confused manner; but it is my opinion that his testimony compels the conclusion that the Wellington did not reverse before collision, It is obvious that reversal at slow speed and while progressing against a strong tide would have had instantaneous effect.

The Oconee, on giving and receiving the single whistle signals, ported her helm, intending to pass diagonally across the bow of the Wellington and go through the channel of the draw on that tug's port side. The launch was in the full strength of the ebb tide. She evidently ported only enough to pass very close to the easterly end of the drawbridge center pier. She did so pass, and within a few feet of that center pier the bow of the Wellington struck her port side from 10 to 15 feet forward of the stern.

The case is, in my opinion, one of special circumstances; but there was an undoubted agreement between these vessels, evidenced by the exchange of single whistles, that they should pass port to port. · It was the duty of the Wellington to facilitate this maneuver by giving the Oconee room, and

.it was equally the duty of the Oconee to recognize the effect of her position in the tide, and also the fact that the Wellington was so close to the center pier that no porting of her wheel would or could enable her to substantially change her position. In my judgment, the Wellington was at fault for not reversing earlier, and not permitting the Oconee to get on her port side before she advanced beyond the easterly end of the center pier. I think it equally clear that the Oconee was at fault for not porting more and not allowing for the tide set, which contributed materially towards carrying her down on the Wellington's bow. Of course, the moment she ported, the tide had more effect upon her broadside.

In making these findings it is not overlooked that according to the testimony of the Oconee's owner the Wellington was considerably further from the center pier than has been found. I think the weight of evidence is against him on this point. The relation of the vessels to each other at the moment of collision is found to have been as testified to by Messrs. Jewett and McCarthy, witnesses from different sides, both apparently cool-headed and intelligent men, and who agreed absolutely on this point.

The libelant may have a decree for half damages.

Harrington, Bigham & Englar (H. S. Harrington, of counsel), for appellant.

James Forrester, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. Decree affirmed, upon the opinion of the District Judge.

---

### BLOCK et al. v. CITY OF MERIDIAN et al.

(Circuit Court of Appeals, Fifth Circuit. March 26, 1912. Rehearing Denied April 13, 1912.)

#### No. 2,306.

MUNICIPAL CORPORATIONS (§ 244*)—CONTRACTS—REQUISITES.

Where, in an action against a city, the contract sued on was one that could only be made valid by an ordinance which could only take effect after being published for ten entire days, and it appeared that publication was stopped before the ten days had expired, and the contract was abandoned by agreement of the parties, plaintiff could not recover thereon.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 678–681, 683; Dec. Dig. § 244.*]

In Error to the Circuit Court of the United States for the Southern District of Mississippi.

Action by I. D. Block and others against the City of Meridian and others. Judgment for defendants, and plaintiffs bring error. Affirmed.

J. Hirsh and G. Q. Hall, for plaintiffs in error.

C. T. Williamson, Wm. H. Armbrecht, W. E. Baskin, and R. E. Wilbourn, for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PER CURIAM. The contract sued on was one that could only be made valid by an ordinance. An ordinance, under the law con-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date. & Rep'r Indexes